**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

A.M.S., *et al.*,

        *Plaintiffs*,

    v.

JOSEPH B. EDLOW,[1] *et al.*,

        *Defendants*.

Civil Action No. 25-476 (RDM)

**MEMORANDUM OPINION**

This case arises from the collapse of the Islamic Republic of Afghanistan following the Taliban's seizure of the capital city of Kabul in August 2021. The United States military evacuated the country, and the U.S. Embassy in Kabul ceased operations. Facing an influx of humanitarian parole applications from Afghan citizens, the United States Citizenship and Immigration Services ("USCIS") adopted a policy ("deprioritization policy") in November 2021 to deprioritize parole applications from Afghans in Afghanistan because the USCIS could not complete processing those applications—which requires fingerprinting, medical assessments, and in-person vetting—without an embassy or consulate in Afghanistan.

Plaintiffs in this action, who filed applications for advance humanitarian parole with the USCIS in October 2022, are fifteen Afghan nationals facing death threats and persecution by the Taliban. Their applications have been pending since then. After waiting for roughly twenty-eight months, they filed this action against the USCIS, its Director, the United States Department

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Joseph Edlow, the current Director of USCIS, is automatically substituted for Kika Scott as the official-capacity defendant.

of Homeland Security ("DHS"), and the Secretary of Homeland Security ("Secretary").  They

seek relief under the Mandamus Act, 28 U.S.C. § 1361, the Administrative Procedure Act

("APA"), 5 U.S.C. § 701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, alleging

unreasonable delay on the part of the USCIS in processing their applications and alleging that the

deprioritization policy is arbitrary and capricious because it accords greater importance to

processing convenience than to humanitarian need.  Plaintiffs seek a court order (1) requiring

Defendants to adjudicate Plaintiffs' parole applications within 30 days; (2) declaring the

deprioritization policy unlawful, Dkt. 1 at 17 (Compl. Prayer), and (3) declaring that the USCIS

"has unreasonably delayed and unlawfully withheld adjudication of these applications and

adopted policies and procedures for adjudicating Afghan humanitarian parole applications that

are arbitrary and capricious," *id.* at 16 (Compl. ¶ 93).

For the reasons explained below, the Court will **GRANT** Defendants' Motion for Relief

from Local Civil Rule 7(n), Dkt. 17, and will **GRANT** Defendants' motion to dismiss without

prejudice, Dkt. 18, for lack of jurisdiction.

## I. BACKGROUND

**A.    Statutory and Regulatory Background**

1.    *Humanitarian Parole*

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, includes several

provisions under which nonimmigrants may be allowed to enter and to remain temporarily in the

United States.  8 U.S.C. § 1182(d)(5)(A), which governs "parole," is one such provision.  It

provides:

> The Secretary of Homeland Security may, except as provided in subparagraph
> (B) or in section 1184(f) of this title, in his discretion parole into the United
> States temporarily under such conditions as he may prescribe only on a case-by-
> case basis for urgent humanitarian reasons or significant public benefit any alien
> applying for admission to the United States, but such parole of such alien shall

> not be regarded as an admission of the alien and when the purposes of such
> parole shall, in the opinion of the Secretary of Homeland Security, have been
> served the alien shall forthwith return or be returned to the custody from which
> he was paroled and thereafter his case shall continue to be dealt with in the same
> manner as that of any other applicant for admission to the United States.

The statute does not require the Secretary to accept, consider, or grant applications for humanitarian parole. No statutory provision or regulation defines "urgent humanitarian reasons" or "significant public benefit."

The Secretary has delegated her parole authority to several department officials and components, which are authorized to grant parole in different contexts. *See* 8 C.F.R. § 212.5(a) (2025); Memorandum of Agreement, *Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with Respect to Certain Aliens Outside of the United States* (Sep. 10, 2008), https://perma.cc/G4QW-G4MD. At issue here is advance humanitarian parole, which "allows an individual, who may be inadmissible or otherwise ineligible for admission into the United States" to seek advance authorization "to be paroled into the United States for a temporary period" "for urgent humanitarian reasons or significant public benefit." *Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States: What is Parole?*, USCIS, https://perma.cc/MM5J-XGME. The "[a]uthority to parole an applicant for admission into the United States under section 212(d)(5) of the INA, 8 U.S.C. § 1182(d)(5), and to issue advance parole documentation" is assigned to the USCIS. *Delegation of Authority to the Bureau of Citizenship and Immigration Services*, Delegation No. 0150.1, § 2(O) (June 5, 2003), https://perma.cc/N8XG-SZCE; *see also* 8 C.F.R. § 2.1 (2025) (outlining the Secretary of Homeland Security's delegation authority).

The application process for advance humanitarian parole proceeds in seven steps. *See Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States: Parole Process*, USCIS, https://perma.cc/MM5J-XGME. Applicants initiate the process by filing two

required forms, a Form I-131 and Form I-134, accompanied by documentation supporting their request and a filing fee.  *Id.*  A USCIS officer then reviews the application, issues Requests for Evidence for additional information, as needed, "document[s] the basis for the decision," and "prepar[es] the decision notice[]."  *Id.*  "A USCIS officer considers each request and the evidence provided on a case-by-case basis, taking into account all of the circumstances."  *Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States: Eligibility for Parole*, USCIS, https://perma.cc/MM5J-XGME.  Circumstances that might constitute an urgent humanitarian reason or a significant public benefit include needing critical medical treatment, needing to support an ill family member, or participating in legal proceedings.  *See id.*  "Having an urgent humanitarian reason or a significant public benefit is a positive determining factor, and it is evaluated against any negative factors present in a case."  *Id.*  The USCIS considers a host of other non-exhaustive factors in evaluating the "complete record."  *Id.*

If the applicant appears eligible for parole, the USCIS will "mail a conditional approval notice or a notice of continued parole processing to the petitioner."  *Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States: Parole Process*, USCIS, https://perma.cc/MM5J-XGME.  Those notices "provide[] information regarding next steps . . . such as scheduling an appointment with the U.S. embassy, biometrics collection, obtaining travel documents, and any conditions the beneficiary must comply with if paroled into the United States."  *Id.*  Notably,

> If the beneficiary is in a country with a U.S. embassy or consulate, [the USCIS] will also notify the U.S. embassy or consulate closest to the beneficiary's residence of [its] decision.  If the beneficiary is not in a country with a U.S. embassy or consulate, the petitioner must notify [USCIS] once the beneficiary travels to a location with a U.S. embassy or consulate before [the USCIS] can continue processing the parole request.

4

*Id.* If the USCIS determines that the applicant is not eligible or if the USCIS does not choose to exercise its discretion to grant parole, it will "mail a denial letter to the petitioner." *Id.*

Upon successful completion of the vetting process, "the consular section issues a document referred to as a boarding foil that allows the beneficiary to travel to the United States within 30 days of it being issued." *Id.*; *see also* 8 C.F.R. § 212.5(f) (2025) ("When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued an appropriate document authorizing travel."). This travel authorization "does not guarantee parole, but it allows the beneficiary" to travel to a U.S. port of entry, where a Customs and Border Protection officer may inspect the applicant and exercise further discretion in authorizing parole and in placing conditions on parole. *Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States: Parole Process*, USCIS, https://perma.cc/MM5J-XGME; *see also* 8 C.F.R. § 212.5(c), (d) (Customs and Border Protection officers "may, after review of the individual case, parole into the United States temporarily in accordance with section 212(d)(5)(A) . . . any alien applicant for admission, under such terms and conditions . . . as he or she may deem appropriate," which may include "requir[ing] reasonable assurances that the alien will appear at all hearings and/or depart the United States when required to do so."). Parole may be revoked if the USCIS determines the parolee no longer needs it or if he or she fails to comply with the imposed conditions. *Humanitarian or Significant Public Benefit Parole for Aliens Outside the United States: Parole Process*, USCIS, https://perma.cc/MM5J-XGME.

2.    *Statutory Jurisdiction*

In 1996, Congress amended the INA to include several jurisdiction-stripping provisions that preclude courts from exercising subject-matter jurisdiction over certain immigration-related

actions. *Kucana v. Holder*, 558 U.S. 233, 249 (2010). As relevant here, 8 U.S.C.

§ 1252(a)(2)(B), provides as follows:

> Notwithstanding any other provision of law (statutory or nonstatutory), including . . . section[] 1361 . . . no court shall have jurisdiction to review—
>
> (i)  any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .

"'[T]his subchapter' refers to Title 8, Chapter 12, Subchapter II, of the United States Code,

codified at 8 U.S.C. §§ 1151–1381 and titled 'Immigration.'" *Kucana*, 558 U.S. at 239 n.3

(alteration in original). Those provisions include the authority to grant parole pursuant to 8

U.S.C. § 1182(d)(5)(A).

**B.      Factual and Procedural Background**

For the purposes of the pending motion to dismiss, the Court will accept the factual

allegations contained in the complaint as true, *see Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137,

1139 (D.C. Cir. 2011), and because Defendants raise challenges to the Court's jurisdiction, *see*

*Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005), the Court will

also take judicial notice of facts outside the pleadings that are "not subject to reasonable dispute"

and that "can be accurately and readily determined from sources whose accuracy cannot

reasonably be questioned," *Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017)

(quoting Fed. R. Evid. 201(b)).

1.      *The Crisis in Afghanistan and USCIS's Deprioritization Policy*

In 2021, "the United States ended its 20-year presence in" Afghanistan. Dkt. 1 at 7

(Compl. ¶ 41). The end came as "the Taliban launched a major offensive against the Afghan

6

National Army and the remaining coalition forces, and, by mid-August, took control of Afghanistan's capital, Kabul." *Roe v. Noem*, 800 F. Supp. 3d 146, 153–54 (D. Mass. 2025). "On or about August 15, 2021, the U.S. Embassy in Kabul closed." *Id.* at 154.  According to Plaintiffs, shortly after the Islamic Republic of Afghanistan collapsed, the USCIS "instructed adjudicators to prioritize Afghan parole cases," and the USCIS "continued processing advance humanitarian parole applications even after the U.S. embassy in Kabul ceased operation on August 15, 2021."  Dkt. 1 at 10 (Compl. ¶¶ 57, 58).  "On August 31, 2021, however, [the] USCIS stopped prioritizing Afghan parole cases," and it placed a hold on these applications between September and November 2021.  *Id.* at 10 (Compl. ¶¶ 59–60).

Plaintiffs further allege that the "USCIS instituted a new policy on November 5, 2021." *Id.* (Compl. ¶ 61).  That policy provided that

> [1] . . . Afghan humanitarian parole applications based on protection needs should generally be denied, and [2] . . . for applicants who were deemed eligible for parole but were located in Afghanistan, [the] USCIS would administratively close the applicant's case until the applicant could report to a U.S. Embassy or Consulate.  [The] USCIS did not tell applicants or the public about the new standards it adopted under the November 5, 2021, policy.

*Id*.  Plaintiffs allege that this policy was in place when they applied for humanitarian parole in October 2022, and a version of it remained operative at the time they filed this action, *id.* at 11 (Compl. ¶¶ 63–67).

Although the Court focuses on the version of the policy in place at the time Plaintiffs applied for parole in October 2022, that version does not, in any event, differ in material respects from the current version of the policy.  *See Information for Afghan Nationals on Requests to USCIS for Parole*, USCIS, https://perma.cc/28TA-6PG2 (last updated Oct. 30, 2025).  At the time of Plaintiffs' applications, the USCIS website informed the public that "the U.S. Embassy in Kabul is closed and [that] all normal consular services in Afghanistan have been suspended."

7

*Information for Afghan Nationals on Requests to USCIS for Humanitarian Parole*, USCIS, https://web.archive.org/web/20220930035019/uscis.gov/humanitarian/humanitarian-parole/information-for-afghan-nationals-on-requests-to-uscis-for-humanitarian-parole.  The website further explained that when an applicant in Afghanistan "may be eligible for parole," the USCIS will "issue a notice informing [the applicant] that [she] must arrange [her] own travel outside of Afghanistan to a country where there is a U.S. embassy or consulate before [it] can fully process [her] parole request."  *Id.*  The website advised the public that the "USCIS is unable to help [applicants] leave Afghanistan at this time," and it instructed applicants to "notify" the USCIS of their new locations and contact information if and when they leave Afghanistan.  *Id.*  Finally, the website advised the public of the policy at issue here:  "We currently are prioritizing parole applications for Afghan nationals outside of Afghanistan given the availability of completing processing for those individuals at a U.S. embassy or consulate, but we continue to process parole applications for individuals in Afghanistan as well."  *Id.*  Simply put, because the U.S. Embassy in Afghanistan was closed, and because an applicant must appear at a U.S. consulate or embassy before the USCIS can "fully process" a parole application, the USCIS adopted a policy to deprioritize (at least in relative terms) applications submitted by individuals in Afghanistan.  *Id.*

2.    *2025 Presidential Proclamations and Implementing USCIS Policies*

On June 4, 2025, President Trump issued Presidential Proclamation 10949, which, subject to certain exceptions not relevant here, "fully suspended" the "entry into the United States of nationals of Afghanistan as immigrants and nonimmigrants."  Proclamation No. 10949, 90 Fed. Reg. 24497, 24499 (June 10, 2025).  Proclamation 10949 granted exception authority to the Attorney General.  *See id.* at 24503.  President Trump, then, issued Proclamation 10998, which continued the suspension of entry of Afghan nationals into the United States, but granted

exception authority to the Secretary of Homeland Security as well.  *See* Proclamation No. 10998, 90 Fed. Reg. 59717, 59722, 59727 (Dec. 19, 2025).

On December 2, 2025, and January 1, 2026, respectively, the USCIS issued policies placing "an adjudicative hold on all . . . pending benefit requests filed by aliens from high-risk countries outlined in" the two proclamations, including Afghanistan.  USCIS, PM-602-0192, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* 2 & 1 n.2 (Dec. 2, 2025) ("*Policy Memorandum 602-0192*"), https://perma.cc/VF76-A2E6; *see generally* USCIS, PM-602-0194, *Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries* (Jan. 1, 2026) ("*Policy Memorandum 602-0194*"), https://perma.cc/AML8-44FJ.  The second memorandum clarifies that a "'hold' allows a case to proceed through processing, up to final adjudication [which] refers to the issuance of a final decision on a case, such as an approval, denial, or dismissal."  *Policy Memorandum 602-1094*, at 1 n.2.

3.      *Plaintiffs' Injuries*

Plaintiffs are members of an extended family of fifteen Afghan nationals ("AMS family") who are seeking advance humanitarian parole in the United States due to the "fall of the Islamic Republic of Afghanistan and corresponding rise of the Taliban in 2021."  Dkt. 1 at 3 (Compl. ¶ 14).  The AMS family includes AMS, his wife (KS), his nine children (BFS, AA, AS, OS, NS, MS, HS II, HS III, and MA II), his two sons-in-law (SS, MA I), and his two grandchildren (HS I, MA III).  *See id.* at 4–6 (Compl. ¶¶ 17–31).

Before the Islamic Republic of Afghanistan collapsed, AMS was an attorney who "represented numerous individuals in political, criminal, and kidnapping cases" and who "represented women seeking divorce from their husbands."  *Id.* at 4 (Compl. ¶ 17).  He represented "one woman in a divorce against a local Taliban commander who physically abused

his wife." *Id.* at 7 (Compl. ¶ 42). As a result, AMS received several threatening visits, letters, and telephone calls from members of the Taliban, and he was told that he and his family would be killed if he continued the representation. *Id.* at 7–8 (Compl. ¶ 42); *see also* Dkt. 3-2; Dkt. 3-3 at 3. The Taliban has issued an arrest warrant for AMS and has attempted to serve the warrant at AMS's former residence. Dkt. 1 at 9 (Compl. ¶ 51).

MA I, one of AMS's sons-in-law, was an intelligence officer who "conducted operations and investigations with the Afghanistan National Directorate of Security." *Id.* at 5 (Compl. ¶ 29). In that role, his "work resulted in the conviction and imprisonment of many members of the Taliban," and, as a result, he has faced "several assassination attempts" and death threats by the Taliban. *Id.*; *see also* Dkt. 3-4 at 3–4. Since the fall of the Islamic Republic of Afghanistan, "the Taliban has obtained MA I's cell phone records and searched his home in Kabul." Dkt. 1 at 8 (Compl. ¶ 46). "MA I has had to relocate multiple times, grow facial hair to disguise his identity, and avoid being seen in public." *Id.*

The AMS family is currently in hiding. *Id.* at 4, 5 (Compl. ¶¶ 17, 29).

On October 21, 2022, each member of the family submitted applications and filing fees for advance parole in the United States. *Id.* at 4, 9 (Compl. ¶¶ 15, 48); *see generally* Dkt. 3-1. The "USCIS issued receipt notices to each of the Plaintiffs." Dkt. 1 at 4 (Compl. ¶ 16); *see also* Dkt. 3-1. At the time Plaintiffs filed suit, and as recently as the oral argument on the pending motion, Plaintiff's applications remained pending. Dkt. 1 at 9 (Compl. ¶ 50); *see* Min. Entry (Mar. 11, 2026). Plaintiffs contend that the deprioritization policy has contributed to this substantial delay, Dkt. 1 at 13 (Compl. ¶ 71), and has "turn[ed] the purpose of humanitarian parole on its head" by "ignor[ing] the realities of the humanitarian crisis" in Central Asia, *id.* at 12 (Compl. ¶¶ 69–70).

10

The USCIS denied one application, HS II's, on July 3, 2024, based on a "purported determination that HS II had already entered the United States and therefore the reason for the parole request no longer existed." *Id.* at 9 (Compl. ¶ 52); *see also* Dkt. 3-6 at 2. Plaintiffs argue that this determination is erroneous because HS II, a fifteen-year-old minor at the time of the Complaint, "has never been to the United States[,] let alone left Afghanistan." Dkt. 1 at 9 (Compl. ¶ 53). Plaintiffs appealed the denial of HS II's application. *Id.* (Compl. ¶¶ 54–55); *see also* Dkt. 3-7.

4.    *Procedural Background*

Plaintiffs filed suit in February 2025, asserting four claims for relief against the USCIS, the Director of USCIS, the Department of Homeland Security, and the Secretary of Homeland Security. *See* Dkt. 1 at 1 (Compl.). Counts I and III assert claims under the APA and the Mandamus Act based on unreasonable delay in the adjudication of their humanitarian parole applications. Dkt. 1 at 13–14, 16 (Compl. ¶¶ 72–81, 88–90). Plaintiffs allege that the "USCIS has a mandatory, nondiscretionary duty to complete adjudication of Plaintiffs' advance humanitarian parole applications," *id.* at 13 (Compl. ¶ 76), and that the 852-day (at the time of the Complaint) delay "is particularly unreasonable under the circumstances because Plaintiffs remain under the imminent threat of being discovered and killed by the Taliban's regime in Afghanistan," *id.* at 14 (Compl. ¶¶ 79–80); *see also id.* at 16 ("USCIS has failed to discharge its mandatory duty to issue an adjudication."). Plaintiffs seek an order directing the USCIS "to adjudicate all Plaintiffs' applications for advance humanitarian parole within 30 days." *Id.* at 17 (Compl. Prayer).

Count II asserts an arbitrary and capricious claim under the APA. *Id.* at 15–16 (Compl. ¶¶ 82–87). In this claim, Plaintiffs challenge the deprioritization policy on the ground that it is "based, at least in part, on impermissible considerations." *Id.* at 15 (Compl. ¶ 86). Plaintiffs

11

contend that one such impermissible consideration is the "USCIS's stated preference for ease of consular processing over the urgency of the applicant's humanitarian need when adjudicating applications." *Id.* In addition, according to Plaintiffs, the "USCIS failed to seriously consider an important aspect of the problem, including the fact that Afghans are unlikely to hold legal status and face likely deportation in the countries that USCIS requires them to be in" for consular processing. *Id.* at 15–16 (Compl. ¶ 86). These alleged deficiencies, Plaintiffs argue, render the deprioritization policy "arbitrary and capricious and otherwise in violation of the APA." *Id.* at 16 (Compl. ¶ 87) (citing 5 U.S.C. § 706(2)(A)). Count IV seeks a "declaration that USCIS has unreasonably delayed and unlawfully withheld adjudication of these applications and adopted policies and procedures . . . that are arbitrary and capricious." *Id.* (Compl. ¶ 93).

Finally, although not addressed in a separate count of the Complaint, Plaintiffs seek an order "direct[ing] [the] USCIS to reinstate HS II's wrongfully denied application." *Id.* at 17 (Compl. Prayer).

On May 30, 2025, Defendants moved for relief from Local Civil Rule 7(n), *see* Dkt. 17, and moved to dismiss the Complaint on both jurisdictional and substantive grounds, *see* Dkt. 18. On March 11, 2026, the Court held oral argument on the pending motions, and, at that point, government counsel informed the Court for the first time of the two Presidential Proclamations and two USCIS policy memorandums described above. Hrg. Tr. (Rough at 7–9). Defense counsel argued that these proclamations and policies proffered further grounds for dismissal, *id.* (Rough at 7–13), but stated its position that because the Court lacks jurisdiction regardless, a decision on any jurisdictional grounds "was more or less equal to us," *id.* (Rough at 31). The Court ordered Plaintiff to file a supplemental brief addressing these new arguments. *Id.* (Rough at 34). Government counsel filed the two proclamations, the two USCIS policy memorandums,

12

and the most recent USCIS deprioritization policy, with a link to the archived versions of the policy. *See* Dkt. 34. On March 18, 2026, Plaintiffs filed their response. *See* Dkt. 35.

Defendants' motion for relief from Local Civil Rule 7(n), Dkt. 17, and their motion to dismiss, Dkt. 18, are now before the Court.

## II. ANALYSIS

### A.      Relief from Local Civil Rule 7(n)

Before proceeding to the substance of Defendants' motion to dismiss, the Court addresses Defendants' Motion for Relief from Local Civil Rule 7(n). That rule provides that "[i]n cases involving the judicial review of administrative agency actions, unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record with the Court . . . simultaneously with the filing of a dispositive motion." LCvR 7(n)(1). Here, Defendants filed a motion for relief from Local Civil Rule 7(n) simultaneously with their motion to dismiss. *See* Dkts. 17 & 18.

Defendants contend that the administrative record is not needed to resolve the threshold motion to dismiss, which is premised on "the Complaint and the documents incorporated by reference therein," Dkt. 17 at 5, and as supplemented by the additional materials that Defendants' counsel referenced at oral argument and has since supplied to the Court. *See* Hrg. Tr. (Rough at 7–9); Dkt. 34. Defendants argue that "[t]he Court will not require the administrative records to adjudicate the Motion to Dismiss pursuant to Rule 12(b)(1) and/or 12(b)(6)" and that Plaintiffs will not need the administrative record to respond to the motion to dismiss. Dkt. 17 at 3. Plaintiffs oppose the motion, contending that "Defendants' motion to dismiss relies heavily on facts outside the [C]omplaint," Dkt. 22 at 3, and that Defendants have failed to demonstrate "good cause" for seeking a waiver of the rule, *id.* at 2.

13

As this Court has observed before, "[p]laintiffs often move to compel production of the administrative record in immigration mandamus cases, and this Court has routinely rejected those motions." *Janay v. Blinken*, 743 F. Supp. 3d 96, 104 (D.D.C. 2024).  Plaintiffs are correct that "APA claims 'are generally considered and decided on the administrative record,' not on the Complaint," Dkt. 22 at 3 (citation omitted), and here, Plaintiffs' claims go beyond an immigration mandamus claim and challenge a substantive agency policy as arbitrary and capricious.  The arguments Defendants raise in their motion to dismiss, however, do not rely "upon the Administrative Record." *Vargus v. McHugh*, 87 F. Supp. 3d 298, 302 (D.D.C. 2015).  Instead, Defendants assume the veracity of Plaintiffs' factual allegations but contend that their claims fail for lack of jurisdiction or as a matter of law.

The Court may take judicial notice of all the remaining information outside of the Complaint raised by Defendants, which are all contained on government websites.  *See, e.g.*, *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 163 n.3 (D.D.C. 2021); *Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (collecting cases that took "judicial notice of information posted on official public websites of government agencies"); *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022).  And, in any event, Defendants' counsel has supplemented the official record with the relevant policies at issue, Dkt. 34, and Plaintiffs have had ample opportunity to respond, Dkt. 35.

Nothing more from the administrative record is necessary to decide the threshold legal questions presented by the pending motion to dismiss, including whether this Court has jurisdiction.  Because "the administrative record is not necessary for the court's decision regarding [the] motion to dismiss," *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d

279, 294 (D.D.C. 2018) (citation modified); *see also Arab*, 600 F. Supp. 3d at 65 n.2 (same), the

Court will grant Defendants' motion for relief from Local Civil Rule 7(n).

**B.    Jurisdiction**

   1.    *H.S. II and Mootness*

As an initial matter, the Court concludes that Plaintiffs' request for relief in the form of

an order directing the USCIS to reinstate H.S. II's wrongfully denied application, Dkt. 1 at 17

(Compl. Prayer), is now moot.  The same day that Defendants moved to dismiss, they filed a

"Notice Regarding [the USCIS's] Decision to Reopen HS II's Application," representing that

"on May 28, 2025, [the] USCIS issued a decision reopening HS II's application on its own

motion."  Dkt. 19 at 1.  Defendants also attached the official reopen decision notice, dated May

28, 2025, and sent to H.S. II's petitioner.  Dkt. 19-1.  In both their response to Defendants'

motion to dismiss and in a status report submitted on October 17, 2025, Plaintiffs contend that

despite Defendants' representations, HS II's application remains "administratively closed."  Dkt.

21 at 11; *see also* Dkt. 28 at 1.

The USCIS case status tracker, however, reveals that HS II's application was, in fact,

reopened on May 30, 2025:



For the purpose of the pending motions, the Court will take judicial notice of both the official reopening decision notice, Dkt. 19-1, and the USCIS case status tracker, and will treat H.S. II's application as pending. *See, e.g.*, *Khazaei v. Blinken*, No. 23-cv-1419, 2023 WL 6065095, at *2 (D.D.C. Sept. 18, 2023) (The court "takes judicial notice of Plaintiffs' visa-application statuses posted on the State Department's website."). Plaintiffs offer no evidence to the contrary, and, in any event, the Court will hold Defendants to their representation that H.S. II's application remains pending—which is the only distinct relief that Plaintiffs seek with respect to H.S. II's application.

In light of this factual development and the USCIS's binding representation, the Court concludes that Plaintiffs' request that the Court direct the USCIS to "reinstate HS II's wrongfully denied application," Dkt. 1 at 17 (Compl. Prayer), is now moot. *See, e.g.*, *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, 157 (D.C. Cir. 2019) ("Typically, an end to offending behavior moots a case."); *Pharmachemie B.V. v. Barr Lab'ys, Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002) (controversy is moot where resolution "will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." (citation omitted)). That leaves H.S. II with the same unreasonable delay and arbitrary and capricious claims raised by the rest of her family.

    2.    *Statutory Jurisdiction*

Turning to claims asserted collectively on behalf of the AMS family, the Court starts and ends with subject-matter jurisdiction. Defendants move under Rule 12(b)(1) to dismiss those claims for lack of jurisdiction on two separate grounds. *See* Fed. R. Civ. P. 12(b)(1). First, they contend that Plaintiffs lack Article III standing because Plaintiffs "lack a right to entry into the United States and therefore have not suffered a legal injury on which they can bring suit." Dkt.

18 at 24.  Second, they argue that 8 U.S.C. § 1252(a)(2)(B) divests the Court of jurisdiction over Plaintiffs' entire suit.  *See id.* at 27–32.

Assessing the Court's jurisdiction usually begins with Article III of the Constitution, which vests federal courts with authority to adjudicate "Cases" and "Controversies."  U.S. Const. art. III, § 2.  Because federal courts are courts of limited jurisdiction, this grant of power also marks the outer boundary of their authority to act.  But even when a court has Article III jurisdiction over a dispute, lower federal courts must also consider whether they have statutory jurisdiction to act.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (federal courts "possess only that power authorized by Constitution *and statute*" (emphasis added)).  Congress may, at times, "strip[] federal courts of jurisdiction over [certain] actions."  *Patchak v. Zinke*, 583 U.S. 244, 250 (2018).  Because subject-matter jurisdiction is "an absolute prerequisite for the continuance of an action," *Dentons U.S. LLP v. The Republic of Guinea*, 134 F. Supp. 3d 5, 7 (D.D.C. 2015), "when [jurisdiction] ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause," *Ex parte McCardle*, 7 Wall. 506, 514 (1869); Fed. R. Civ. P. 12(h)(3).

Because Article III and statutory jurisdiction both implicate the Court's power to act, the Court need not resolve the constitutional question before turning to the statutory one.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (Both "the courts' *statutory* [and] constitutional power to adjudicate the case" "implicate subject-matter jurisdiction" (emphasis altered)); *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514 (D.C. Cir. 2018) ("[N]othing in *Steel Co.* establishes an order of priority as between alternative jurisdictional grounds for disposing of a case.").  Here, the Court starts with the question of statutory jurisdiction because it is clearcut and dispositive.

17

Before doing so, the Court pauses to note that the two recently issued presidential proclamations, Proclamation No. 10949, 90 Fed. Reg. 24497 (June 10, 2025); Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 19, 2025), and the two related USCIS policy memoranda, *Policy Memorandum 602-0192* and *Policy Memorandum 602-0194*, pose an additional, and possibly insurmountable, barrier to Afghan nationals seeking humanitarian parole. In the ordinary course, the Court might feel compelled to decide whether these intervening directives have either mooted Plaintiffs' claims or have rendered them non-ripe. But because Section 1252(a)(2)(B)(ii) is itself jurisdictional, the Court can address Defendants' Section 1252(a)(2)(B)(ii) defense, which is fully briefed, and need only address the intervening directives if that defense proves unsuccessful.

The Court, accordingly, turns to statutory jurisdiction.

**a.**

Plaintiffs premise their theory of statutory jurisdiction on 28 U.S.C. § 1331, which confers jurisdiction on the federal district courts to adjudicate "all civil actions arising under the Constitution, laws, or treaties of the United States," and the Mandamus Act, which "confers jurisdiction on the [federal] district courts over actions 'in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff,'" *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (quoting 28 U.S.C. § 1361). The Court, moreover, must read these grants of jurisdiction "against the backdrop of . . . 'the presumption favoring judicial review of administrative action.'" *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020) (quoting *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020)).

But the Court must also consider whether any jurisdiction-stripping provision takes away what Section 1331 or Section 1361 grants and, in particular, must determine whether any such

provision offers "'clear and convincing evidence' of congressional intent to preclude judicial review." *Id.* at 624.  Here, the relevant counterweight to Section 1331and Section 1361 is found in 8 U.S.C. § 1252(a)(2)(B)(ii), which bars federal courts from exercising federal question or mandamus jurisdiction to review "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security."

As the D.C. Circuit explained in *iTech U.S., Inc. v. Renaud*, "the question [whether Section 1252(a)(2)(B)(ii) bars review] is two-fold."  5 F.4th 59, 62 (D.C. Cir. 2021).  First, the Court must ask whether the challenged conduct of the Secretary's authority under the parole statute, 8 U.S.C. § 1182(d)(5)(A), "could fall under clause (ii)'s umbrella," that is, whether the conduct constitutes "any other decision or action."  *Id.* at 62–63.  Second, "[i]f so, [the Court] ask[s] whether [the parole statute] specifies that" the decision at issue falls within "the Secretary's discretion."  *Id.* at 62.  Because Section 1252(a)(2)(B)(ii) applies to discretionary authorities "specified under this subchapter," and not, more generally, to all discretionary acts, the provision is properly construed to "refer to statutory, but not to regulatory, specifications." *Kucana*, 558 U.S. at 237.  Accordingly, the jurisdiction-stripping provision applies "only when Congress itself set out the [Secretary's] discretionary authority in the statute."  *Id.* at 247.  But "a decision may be 'specified . . . to be in the discretion of the [Secretary]' even if the grant of authority to make that decision does not use the word 'discretion.'"  *Zhu v. Gonzales*, 411 F.3d 292, 294–95 (D.C. Cir. 2005) (first alteration in original).  Section 1252(a)(2)(B)(ii) is "not a narrowly cabined provision," *iTech U.S., Inc.*, 5 F.4th at 64, but, rather, "preclude[s] judicial review of [the array of] decisions 'specified under this subchapter to be in the discretion of the Attorney General or the Secretary,' whether or not those decisions grant or deny an immigrant

relief," *id.* at 66.  If the answer to both *iTech U.S.* questions is "yes," then Section

1252(a)(2)(B)(ii) strips the district court of jurisdiction, and the agency actions at issue are not

subject to judicial review.  *Id.* at 62.

Here, Defendants contend that because Section 1182(d)(5)(A)—the statutory provision

governing humanitarian parole—provides the Secretary of Homeland Security with unfettered

discretion in the realm of humanitarian parole, Section 1252(a)(2)(B)(ii) bars review of both final

parole decisions and, most importantly here, the prioritization and pace of parole applications

because these decisions are "decisions" and "actions leading up to" the final parole decision.

Dkt. 18 at 28, 29.  Prioritization and pace, according to Defendants, are "inextricably linked" to

the decision "whether and when to grant parole" and, accordingly, "are part of the discretion

afforded to the Secretary."  *Id.* at 31.  In this sense, the decision to devote resources to those who

can complete the process, rather than those who have no access to a U.S. consulate or embassy,

is a decision with respect to Plaintiffs' applications for parole—in essence, the agency is saying

"not now, but perhaps later."

Plaintiffs challenge two agency actions: the deprioritization policy and the delay in

adjudicating their specific applications.  In ordinary course, the Court would consider each action

separately.  But Plaintiffs' Complaint is ambiguous, and at times, conflicting, about the

deprioritization policy's relationship to their pending applications.  On the one hand, they appear

to frame the delay as an unexplained "**lack of** decision and **in**action," independent of the

deprioritization policy.  Dkt. 21 at 17 (emphases in original).  In their "[p]rayer [f]or [r]elief,"

Plaintiffs request an order declaring that the deprioritization policy "may not be used in

adjudicating Plaintiffs' applications," which suggests that Plaintiffs seek to preempt possible

*future* application of the policy.  Dkt. 1 at 17 (Compl. Prayer).  On the other hand, Plaintiffs

20

allege that the deprioritization policy already "contributes to the delay Plaintiffs currently experience," *id.* at 13 (Compl. ¶ 71), and that they "sued seeking an order compelling Defendants to **adjudicate** their parole applications that have been pending for almost 1,000 days *due to arbitrary agency action by USCIS*," Dkt. 21 at 16 (first emphasis in original, second emphasis added); *id.* at 19 (challenging "arbitrary-and-capricious agency policies *that resulted in unreasonable delay*" (emphasis added)).  At oral argument, Plaintiffs seemed to pursue the former theory: "the fact [that] there is no decision."  Hrg. Tr. (Rough at 23).

Government counsel was, at first, unable to clarify whether Plaintiffs' applications are being delayed pursuant to the deprioritization policy or for other reasons.  Government counsel eventually explained, however, that the USCIS has applied the policy to the "pool of applications" from individuals in Afghanistan, which includes Plaintiffs.  *Id.* (Rough at 41).  Nor is there any dispute that the deprioritization policy exists.  As a result, the delays in the adjudication of Plaintiffs' applications and the adoption of the deprioritization policy are, in a sense, inseparable.  For that reason, the Court will consider the applicability of Section 1252(a)(2)(B)(ii) to Plaintiffs' APA and Mandamus claims challenging the deprioritization policy and the unreasonable delay in the adjudication of their applications in tandem.  But even if the Court were to construe the unreasonable delay claims as challenging independent inaction on the part of the USCIS, the result would be the same.  Regardless of the framing, the Court lacks jurisdiction over Plaintiffs' claims.

The deprioritization policy and the decision to deprioritize Plaintiffs' applications satisfy the first prong of the *iTech U.S.* inquiry, which asks whether the claim at issue challenges a "decision or action."  *iTech U.S., Inc.*, 5 F.4th at 63.  Here, Defendants assert that Plaintiffs' Complaint challenges the Secretary's "decisions" relating to the prioritization and pace of her

consideration of parole applications, and, in particular, her decision to deprioritize applications submitted by those with no access to a U.S. consulate or embassy.  The Court agrees that Plaintiffs' claims challenge the Secretary's "decisions" within the meaning of Section 1252(a)(2)(B)(ii).  As the D.C. Circuit held in *iTech U.S.*, the words "decision" and "action," when read in context, include more than final determinations respecting the granting or denial of "relief."  *Id.* at 63–66.  The word "decision," moreover, means a "determination arrived at after consideration of facts, and, . . . law."  *Decision*, *Black's Law Dictionary* (6th ed. 1990).  If this was a case in which Plaintiffs alleged that the USCIS had simply forgotten about their applications, one might reasonably argue that the challenge has nothing to do with a "decision" or "action" that the agency made.  But whether viewed as a challenge to the deprioritization policy writ large or as a challenge to the agency's lengthy delay in adjudicating their individual applications as a result of that policy, the gravamen of Plaintiffs' Complaint is that the Secretary is ignoring a humanitarian crisis and is irrationally favoring the "ease of consular processing over the urgency of the applicant's humanitarian need."  Dkt. 1 at 15 (Compl. ¶ 86).  Whether rational or not, however, that is a "decision."

The Court is also persuaded that the challenged conduct satisfies the second prong of the *iTech U.S.* test, which asks whether the INA commits the "decision" at issue to the Secretary's discretion.  5 F.4th at 62.  Section 1182(d)(5)(A) provides that the Secretary "*may . . . in his discretion* parole into the United States temporarily *under such conditions as he may prescribe* only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."  8 U.S.C. § 1182(d)(5)(A) (emphasis added).  The provision radiates with words of discretion.  It "contains not one, not two, but three discretionary terms," *Karakenyan v. USCIS*, 468 F. Supp. 3d 50, 56 (D.D.C. 2020): "may," "in

22

h[er] discretion" and "under such conditions as [s]he may prescribe," 8 U.S.C. § 1182(d)(5)(A).

*See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Dole*, 919 F.2d

753, 756 (D.C. Cir. 1990) ("may" indicates discretion). "[I]t is clear on the face of [Section

1182(d)(5)(A)] that [it] is a quintessential grant of discretion to the Secretary." *Bouarfa v.

Mayorkas*, 604 U.S. 6, 13 (2024).

Because Section 1182(d)(5)(A) specifies that the Secretary "may prescribe" the

"conditions" under which parole may be granted, "[the] statutory grant[] of discretion and

authority also encompass[es] the discretion to control the procedures under which applications

are considered" and the "authority to prescribe regulations governing the consideration of such

applications." *Geneme v. Holder*, 935 F. Supp. 2d 184, 190 (D.D.C. 2013). This discretion

includes both the Secretary's authority to prescribe application requirements, such as an in-

person interview, fingerprinting, and medical screening—conditions that Plaintiffs do not

dispute—and the authority to decline to waive those conditions or to prioritize those applications

that can meet them. *See, e.g.*, *Bouarfa*, 604 U.S. at 15 (noting that "[b]y granting the Secretary

discretion to revoke the agency's approval of visa petitions, Congress has also vested the

Secretary with discretion to *decline* to revoke an approval the agency previously gave."

(emphasis in original)); *Zhu*, 411 F.3d at 295–96 (concluding that the decision to decline to

waive a certification requirement "in the national interest" when statute permitted such waiver

for certain immigrant visas was not reviewable under Section 1252(a)(2)(B)(ii)). The discretion

to place conditions on the adjudication and prioritization of parole applications, accordingly, is

not "assume[d], contemplate[d], or anticipate[d];" it is "unambiguously specifie[d]."

*Karakenyan*, 468 F. Supp. 3d at 56 (quoting *Polfliet v. Cuccinelli*, 955 F.3d 377, 382 (4th Cir.

2020)).

23

At least five circuits have adopted this reasoning and have held that Section 1252(a)(2)(B)(ii) precludes judicial review of unlawful withholding or unreasonable delay claims premised on predicate discretionary policies adopted to govern the adjudication of immigration benefits under similar discretion-conferring provisions of the INA.  The Third, Fourth, Fifth, Eighth, and Eleventh Circuits considered challenges seeking to set aside the USCIS's "adjudication hold" or "retrogression hold" policy, under which USCIS officers placed applications for adjustment of status in abeyance in light of certain annual caps or other limitations on current visa availability.  *See, e.g.*, *Kale v. Alfonso-Royals*, 139 F.4th 329, 333 (4th Cir. 2025).  In each of those challenges, Plaintiffs brought only unlawful withholding or unreasonable delay claims, but, like Plaintiffs here, *see* Dkt. 1 at 17 (Compl. Prayer), the plaintiffs asked the district courts to "declare the retrogression policy unlawful and unreasonable" and to "enjoin USCIS and the Department of State from applying it."  *Kanapuram v. Dir., USCIS*, 131 F.4th 1302, 1305–06 (11th Cir. 2025); *see also Thigulla v. Jaddou*, 94 F.4th 770, 773 (8th Cir. 2024); *Geda v. Dir., USCIS*, 126 F.4th 835, 838 (3d Cir. 2025); *Cheejati v. Blinken*, No. 4:23-cv-600, 2023 WL 4303638, at *1, *4 (E.D. Tex. June 30, 2023), *vacated and remanded*, 106 F.4th 388 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1126 (2025); *Kale v. Jaddou*, No. 5:22-cv-338, 2023 WL 4939367, at *1 (E.D.N.C. Aug. 2, 2023), *aff'd sub. nom. Kale v. Alfonso-Royals*, 139 F.4th 329 (4th Cir. 2025).  The language of the governing provision of the INA at issue reads: "[t]he status of an alien who was inspected and admitted or paroled into the United States . . . *may* be adjusted by the Attorney General, *in his discretion* and *under such regulations as he may prescribe* . . . ."  8 U.S.C. § 1255(a) (emphases added).

Each circuit concluded that Section 1252(a)(2)(B)(ii) barred review of both the adjudication hold policy and the decision to delay the adjudication of the plaintiffs' applications

in light of the policy.  In support of that latter conclusion, each circuit read Section 1255(a) as conferring broad discretion on the Attorney General to adopt procedures that guide adjudication of visa adjustments.  *See, e.g.*, *Kanapuram*, 131 F.4th at 1308 ("The creation of [the] policy, and the decision to delay adjudicating the appellants' applications in compliance with this policy, fall within the scope" of the discretion-granting statute); *Thigulla*, 94 F.4th at 775 ("[T]he decision to delay adjudicating the Thigullas' status adjustment applications, based on the creation of the Adjudication Hold Policy, was within the Attorney General's discretionary authority."); *Cheejati*, 106 F.4th at 394–95 ("Section 1255(a) expressly leaves . . . the pace at which [the] process is undertaken" and the retrogression hold "regulations, and the conduct they direct DOS and USCIS to undertake" to Attorney General's discretion.); *Geda*, 126 F.4th at 844 (The court lacks jurisdiction "to review both the decision to put the [plaintiffs'] applications on hold *and* the 'inextricably intertwined' process 'prescribed' by the [USCIS] for reaching that decision." (emphasis in original)).  As the Fourth Circuit explained, under the statute,

> USCIS is not only granted discretion with respect to the ultimate decision on whether to grant adjustment of status.  USCIS also has the discretion to "prescribe" the regulations that guide its exercise of the discretionary authority.  Thus, . . . the establishment of the adjudication hold policy—is plainly within the statutory grant of discretion.

*Kale*, 139 F.4th at 335.

The present case is on all fours with this precedent.  Just as the USCIS decided to hold status adjustment applications in abeyance under the adjudication hold policy due to the practical realities of supply and demand, under the deprioritization policy, the USCIS has decided to deprioritize humanitarian parole applications submitted by those present in Afghanistan due to practical constraints that preclude completion of application processing.  And just as Section 1255(a) grants the Attorney General discretion over "the ultimate decision on whether to grant adjustment of status" and to "'prescribe' the regulations that guide its exercise of the

discretionary authority," *Kale*, 139 F.4th at 335, Section 1182(d)(5)(A) grants the Secretary of Homeland Security discretion over the ultimate decision whether to grant humanitarian parole and to "prescribe" "conditions" that guide that discretionary authority. In general, administrative decisions regarding how most effectively to allocate scarce resources are inherently discretionary, and, here, the exercise of that discretion is backed up by clear statutory text.

The Court, accordingly, concludes that the text of Sections 1252(a)(2)(B)(ii) and 1182(d)(5)(A), when considered in conjunction, offer "clear and convincing evidence that Congress intended to preclude judicial review of the [Secretary's] discretionary decisions about the [humanitarian parole] process," including the deprioritization policy and its application to individual applicants. *Thigulla*, 94 F.4th at 776. It is not the Court's role to second guess the wisdom of the Secretary's decision to condition the expeditious processing of parole applications on the applicant's ability to visit a U.S. consulate or embassy to complete the process.

**b.**

Plaintiffs offer two responses, one that pertains to their unreasonable delay claims under the Mandamus Act and the APA, and one that pertains to their arbitrary and capricious challenge to the deprioritization policy. First, they contend that their unreasonable delay claims do not challenge "a decision or action," but rather "**a lack of** decision and **in**action, which courts have determined are not stripped by section 1252." Dkt. 21 at 17 (emphases in original). Second, they contend that their challenge to "the legality of policies and processes governing discretionary decisions under the INA" is not barred by Section 1252(a)(2)(B)(ii). *Id.* at 19 (citation omitted). Neither argument is convincing.

*First*, to the extent that Plaintiffs characterize their unreasonable delay claims as a challenge to "inaction," they tread familiar ground. The adoption of a general policy relating to

26

the prioritization of parole applications is clearly an agency "action" or "decision." But even without a general policy determination, the pace at which the USCIS considers particular applications necessarily involves a series of "decisions" regarding the allocation of resources, the relative urgency of different parole applications, the nature of information the agency has or needs before an affirmative determination can be made, and whether and when an in-person appearance is needed to move forward with an application. *See Beshir v. Holder*, 10 F. Supp. 3d 165, 174 (D.D.C. 2014) ("The term 'action' must encompass the discretionary pace at which the adjustment process proceeds because it encompasses the various other discretionary acts that constitute the process as a whole and that direct the pace of the process."); Sep. 15, 2025 Hrg. Tr. (Rough at 24:2–24), *Mitishov v. Alfonso-Royals*, No. 25-cv-2113 (D.D.C. Sep. 15, 2025).

The Secretary's discretion to parole individuals "into the United States temporarily *under such conditions as [s]he may prescribe*," 8 U.S.C. § 1182(d)(5)(A) (emphasis added), carries with it the discretion to require a personal visit to a consulate or embassy before deciding whether to grant parole and the discretion to decide that other parole applications merit more expedient treatment because they are more likely to result in some form of affirmative relief. *See Beshir*, 10 F. Supp. 3d at 173–76 (Pace of processing adjustment of status applications unreviewable under Section 1252(a)(2)(B) where relevant statutes state that the Secretary or Attorney General "in [their] discretion and under such regulations as [they] . . . may prescribe," "may adjust the status of any alien"); *Karam v. Garland*, No. 21-cv-0915, 2022 WL 4598626, at *6–8 (D.D.C. Sept. 30, 2022) (Pace of processing admission of refugees unreviewable under Section 1252(a)(2)(B) when statute states "the Attorney General may, in the Attorney General's discretion and pursuant to such regulations as the Attorney General may prescribe, admit any refugee . . . ").

27

As Plaintiffs' own allegations demonstrate, *see, e.g.*, Dkt. 21 at 28 ("[A]n applicant actively being persecuted by the government of Afghanistan and who remains in Afghanistan is in more urgent need of humanitarian parole than an applicant who has fled the Taliban to another country."), the prioritization and pace of humanitarian parole determinations are wrapped up with the Secretary's assessment of the urgency and availability of the relief sought.  Plaintiffs, understandably, disagree with the Secretary's assessment of these considerations.  But they are inseparable from the exercise of her discretion to decide whether and when humanitarian parole is warranted.

*Second*, Plaintiffs argue that their arbitrary and capricious challenge to the deprioritization policy stands on different footing than a challenge to the Secretary's exercise of her discretion to grant or deny any individual application for parole and that, even if her individual decisions are not reviewable, the deprioritization policy is.  At least two district courts have concluded that Section 1252(a)(2)(B)(ii) does not strip the Court of jurisdiction to adjudicate arbitrary and capricious challenges to the deprioritization policy at issue here.  *See Roe v. Mayorkas*, No. 22-cv-10808, 2023 WL 3466327, at *9, *12 (D. Mass. May 12, 2023); *Azizi v. Noem*, No. 2:24-cv-2959, 2025 WL 2644624, at *1, *3 (E.D. Cal. Sep. 15, 2025).  In both cases, the courts concluded that Section 1252(a)(2)(B)(ii) "does not strip the Court of jurisdiction to hear challenges to the policies and practices governing humanitarian parole."  *Roe*, 2023 WL 3466327, at *7–8 (D. Mass. May 12, 2023) (collecting cases); *Azizi*, 2025 WL 2644624, at *3 (same).  Plaintiffs rely on the *Roe* decision (and the authorities cited in that decision) for the proposition that "courts have declined to apply [Section 1252(a)(2)(B)(ii)] to claims challenging the legality of policies and processes governing discretionary decisions under the INA."  Dkt. 21 at 19 (quoting *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 135 (D.D.C.

2018)); *see also id.* (citing *Damus v. Nielsen*, 313 F. Supp. 3d 317, 327 (D.D.C. 2018) and *Abdi v. Duke*, 280 F. Supp. 3d 373, 384–85 (W.D.N.Y. 2017)).

The D.C. Circuit has yet to address this question, and district courts have taken divergent views regarding the application of Section 1252(a)(2)(B)(ii) in various scenarios, including to policies implementing Section 1182(d)(5)(A). *Compare Roe*, 2023 WL 3466327, at *7–8, *and Azizi*, 2025 WL 2644624, at *3, *with Cnty. of San Diego v. Nielsen*, 465 F. Supp. 3d 1073, 1085 (S.D. Cal. 2020) (Section 1252(a)(2)(B)(ii) barred a challenge to the "conditions under which Defendants are releasing [] individuals" on parole under Section 1182(d)(5)(A) because, under that statute, "Defendants have the discretion to change the conditions under which they parole individuals, including whether they provide travel and basic necessities."), *and New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1196 (D.N.M. 2020) ("[C]ongressional intent to preclude review of parole conditions is fairly discernible" and Section 1252(a)(2)(B)(ii) "therefore precludes any structural challenges to parole decisions." (citation modified)).  Against this backdrop, it is fair to say that no consensus has developed regarding the interplay between Section 1252(a)(2)(B)(ii), Section 1182(d)(5)(A), and arbitrary and capricious challenges.

For present purposes, the Court need not join the wider debate and can limit its analysis to the question whether Section 1252(a)(2)(B)(ii) divests the district courts of jurisdiction to consider an arbitrary and capricious challenge to a USCIS policy that deprioritizes parole applications submitted by Afghan nationals living in Afghanistan.  Focused in this manner, many of the cases that Plaintiffs invoke, and that the *Roe* and *Azizi* courts relied upon, are unhelpful. On Plaintiffs' telling, these cases stand for the broad proposition that all "challenges to parole *policies*" are reviewable under Section 1252(a)(2)(B)(ii).  Dkt. 21 at 19 (emphasis added).  They do not.  *Damus v. Nielsen*, *Aracely, R. v. Nielsen*, and *Abdi v. Duke* each involved challenges to

29

certain ICE policies on multiple grounds, including under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which has "come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others," *Battle v. Fed. Aviation Admin.*, 393 F.3d 1330, 1336 (D.C. Cir. 2005). *See Damus*, 313 F. Supp. 3d at 323–24, 325 (summarizing plaintiffs' claims and describing plaintiffs' *Accardi* challenge to ICE's failure to comply with its own Parole Directive, which guaranteed certain procedural rights in seeking parole); *Aracely, R.*, 319 F. Supp 3d at 122, 124 (same); *Abdi*, 280 F. Supp. 3d at 380–81 (same). Each decision, in turn, relied on the Supreme Court's decision in *Zadvydas v. Davis*, which involved statutory and constitutional challenges to the legality of the plaintiffs' detention pending removal from the United States. *See generally* 533 U.S. 678, 682–86 (2001). As relevant here, *Zadvydas* held that Section 1252(a)(2)(B)(ii) did not bar judicial review of the plaintiffs' claims because "the extent of the Attorney General's authority under the post-removal-period detention statute . . . [was] not a matter of discretion." *Id.* at 688.

It was in this context that the *Damus*, *Aracely, R.*, and *Abdi* courts concluded that Section 1252(a)(2)(B)(ii) does not bar *Accardi*-based arbitrary and capricious challenges, *Damus*, 313 F. Supp. 3d at 327–28; *Aracely, R.*, 319 F. Supp at 135–36; *Abdi*, 280 F. Supp. 3d at 384–85, because, as the D.C. Circuit recently clarified in applying Section 1252(a)(2)(B)(ii), discretion-granting statutes do not typically "afford[] the agency discretion to depart from its own binding regulations or precedents in making" otherwise unreviewable, discretionary determinations. *Castaneira v. Noem*, 138 F.4th 540, 549 (D.C. Cir. 2025). In distinguishing other cases in which Section 1252(a)(2)(B)(ii) applied, the *Castaneira* court noted that "*[u]nlike in cases addressing whether the agency is free to set the standard of proof it chooses*, the underlying question before us is whether the agency can arbitrarily depart from the standard it chooses to set." *Id.* at 550

30

(emphasis added) (citation omitted); *see also Kale*, 139 F.4th at 336 n.3 (distinguishing an *Accardi* challenge from a policy challenge on the same grounds); *Kanapuram*, 131 F.4th at 1308 (same). Together, these cases make clear that Plaintiffs' proposed Section 1252(a)(2)(B)(ii) "carveout" for challenges to the "legality of policies and processes governing discretionary decisions under the INA," Dkt. 21 at 19 (citation omitted), is not really an exception but, rather, an application of the discretion test. Section 1252(a)(2)(B)(ii) withdraws jurisdiction "only when Congress itself [has] set out the [Secretary's] discretionary authority in the statute." *Kucana*, 558 U.S. at 247. The line of cases applying *Accardi* deals with the distinct question whether an agency is bound to follow its own rules, and no one has ever suggested that Section 1182(d)(5)(A) grants the Secretary authority to violate her own binding rules.

Here, Plaintiffs challenge the reasonableness of the USCIS's policy choice; they do not allege that the agency has arbitrarily departed from any binding agency policy or procedure, governing statute, or constitutional provision. Appreciating this hurdle, Plaintiffs attempt to recharacterize their claim as a statutory challenge. In their opposition brief, they argue that the "USCIS's [deprioritization] [p]olicy" "[v]iolates [s]tatutory [r]equirements" and "violates the law," Dkt. 21 at 27, and they maintain that "courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," *id.* at 28 (citation omitted). But the Complaint includes no such claim. It alleges only that the deprioritization policy arbitrarily weighed the "ease of consular processing over the urgency of the applicant's humanitarian need," "failed to seriously consider" the difficulties that Afghan nationals would face in relocating to countries with operating U.S. consulates or embassies, Dkt. 1 at 15–16 (Compl. ¶ 86), and, more generally, failed to accord sufficient weight to "the imminent threat on the lives of AMS and his family," *id.* at 9 (Compl. ¶ 50). Considerations of this type—even

31

those that implicate life or death circumstances—however, are precisely what Section

1182(d)(5)(A) leaves to the Secretary's sole discretion.

For similar reasons, the Supreme Court's dicta in *Biden v. Texas* is too thin a reed to

support Plaintiffs' contention that their arbitrary and capricious challenge to the deprioritization

policy is reviewable. *See* Dkt. 21 at 19–20 (citing *Biden v. Texas*, 597 U.S. 785 (2022)). In that

case, the Supreme Court concluded that DHS's termination of the Migrant Protection Protocols

did not violate Section 1225(b)(2)(C), *Biden*, 597 U.S. at 802–07, which provides that when "an

alien . . . who is arriving on land . . . from a foreign territory contiguous to the United States, the

[Secretary] may return the alien to that territory pending" removal proceedings, *id.* at 801

(alterations in original). The Court's principal holding merely recognized that the word "may"

means "may" and that the authority conferred by Section 1225(b)(2)(C) is discretionary and not

mandatory. *See generally id.* at 802–07. But the Court concluded its analysis by also noting that

the parole statute, 8 U.S.C. § 1182(d)(5)(A), "authorizes DHS to process applicants for

admission" using its parole authority. *Id.* at 806. In mentioning that option, the Court added the

following aside, which Plaintiffs now trumpet:

> Importantly, the authority is not unbounded: DHS may exercise its discretion to
> parole applicants "only on a case-by-case basis for urgent humanitarian reasons
> or significant public benefit." And under the APA, DHS's exercise of discretion
> within that statutory framework must be reasonable and reasonably explained.

*Id.* at 806–07 (citation omitted) (citing *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)).

Plaintiffs make too much of this aside, which adds nothing to their argument here. The

Supreme Court's comment regarding the scope of the Secretary's authority under Section

1182(d)(5)(A) is both clearly correct and plainly inapposite. The fact that the Secretary's parole

authority is "not unbounded," *id.* at 806, is clear on the face of the statute, which says that the

32

Secretary may grant parole "*only* on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A) (emphasis added).  The scope and application of that limitation on the Secretary's authority are not at issue in this case, because no one contends that the Secretary has paroled individuals who lack an urgent humanitarian reason or whose paroles fail to advance a significant public benefit.  More to the point, the fact that the Secretary's authority is limited in a respect that is not at issue in this case says nothing about whether her statutory "discretion" to grant or deny parole as she "may" decide and subject to the conditions she "may prescribe" is subject to arbitrary and capricious review.  And, as explained above, absent a claim that she has violated a binding statutory or regulatory limitation on her parole authority, her implementation of the parole statute is non-reviewable.  The central point is that the INA grants the Secretary broad discretion to decide whether, when, and under what conditions to grant parole, and the USCIS policy deprioritizing applications submitted by Afghan nationals inside of Afghanistan falls squarely within the zone of discretion.

*   *   *

The Court, accordingly, lacks jurisdiction to adjudicate Plaintiffs' APA and Mandamus Act claims.  Having concluded the Court lacks jurisdiction, moreover, the action is not "already properly before the Court," *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, 784 F. Supp. 3d 1, 35 (D.D.C. 2025) (citation omitted), and accordingly, the Court lacks a basis to consider Plaintiffs' request for declaratory relief.  The Court does not doubt the extreme gravity of the circumstances that Plaintiffs face, but that is an argument to raise with the Secretary and her delegees, who Congress has vested with unreviewable discretion to grant parole "for urgent humanitarian reasons."  8 U.S.C. § 1182(d)(5)(A).  The Court, however, "lacks the authority to end their wait,"

33

*Mohammed v. Biden*, No. 20-cv-01856, 2024 WL 2372182, at *2 (D.D.C. Apr. 2, 2024), and

must, accordingly, dismiss Plaintiffs' Complaint without prejudice for lack of jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' Motion for Relief from

Local Civil Rule 7(n), Dkt. 17, and will also **GRANT** Defendants' Motion to Dismiss, Dkt. 18.

A separate order will issue.


     /s/ Randolph D. Moss
     RANDOLPH D. MOSS
     United States District Judge


Date:  March 27, 2026